(33 South. 737.)

No. 14,318.

FATJO v. SEIDEL.

(Feb. 16, 1903.)

APPEAL—EVIDENCE—SLANDER—DAMAGES.

1. Similarity in statements of witnesses, which ordinarily would be suspicious, is less so where the witnesses lived together, and the event testified about is one over which they must have conversed a great deal among themselves.

2. The defendant, a man of means, having without justification called the plaintiff a thief in the presence of her family, $500 damages is allowed.

(Syllabus by the Court.)

Appeal from civil district court, parish of Orleans; Fred D. King, Judge.

Action by Helen Fatjo against Gustave Seidel. From the judgment rendered the plaintiff appeals. Modified and affirmed.

Richardson & Soulé, for appellant. William Stirling Parkerson, for appellee.

PROVOSTY, J. Plaintiff demands damages of the defendant, as follows: For insulting, abusing, and defaming and slandering her, $500; for injury to her feelings, character, and reputation, $3,000; for punitory damages, $2,000.

The particular acts and words of the defendant on which plaintiff bases her complaint are detailed by her in her testimony as follows:

"I was sitting behind the counter, repairing an umbrella, and my sister was standing in front, and my son was at the desk, writing. Mr. Seidel comes in there in a very rough manner, places both hands on his hip, and he says (excuse the expression): 'What in the hell did you have business to transfer my water to your house, and order my water closed?' I answered politely: 'No, sir; I did not order your water closed.' 'Well,' he says, 'dress yourself quick, and come on uptown with me.' I says: 'No, sir; I did not order your water closed.' He pointed his hand at me. He says (excuse the expression): 'You God damned thief, you robbed me of five thousand dollars. You robbed me of my water, you thief. You have a house. I will make things hot for you. You will never have a day's luck in it. I will take it from you.' My sister says: 'That is a mistake. My sister did not order your water closed.' He stepped up to her with his hands up. He says: 'I am not talking to you; I am talking to her.' He says to me: 'I will make things hot for you.' I says: 'Remember, you will have to prove that I am a thief.' He says: 'Run to your lawyer. I will make you give him some money.' I says, 'Never mind, I will make you prove that I am a thief.'"

The sister and the son of the plaintiff corroborate her in this statement. In fact, the three witnesses testify not only to the same facts, but so nearly in the same words that counsel for defendant has printed their testimony in three separate columns on one page of his brief, and contends that the three statements are so precisely alike as to be in reality but one—presumably that of the plaintiff—and should not count for more than the testimony of a single witness. The sameness may be accounted for, we think. The witnesses lived together. In all probability they spent most of their time in the same room. The episode was probably the most exciting in their lives. They must have talked it over a great deal among themselves, and told the story of it to others over and over again in each other's presence. Under these circumstances, there is nothing very surprising if they have fallen into the habit of telling the story pretty much in the

same words. Sufficient variations crop out, we think, to show that the witnesses are not repeating, parrot-like, a tale learned by rote, but that they are describing what they have seen and heard.

Taking the statement to be true, the next question is as to what amount of damages should be allowed.

To begin at the beginning the story of the trouble between the parties, the husband of plaintiff borrowed from the defendant $2,000, and to secure the loan mortgaged the house he lived in, and shortly afterwards died. For some time after his death the debt was permitted to run, plaintiff paying the interest, until, all the notes having matured, defendant insisted upon payment, and the succession of the husband had to be opened, and the property sold. Plaintiff claimed her widow's homestead of $1,000, and, the proceeds of the property not being sufficient to pay both it and the mortgage debt, defendant resisted the claim, contending that plaintiff had agreed not to claim the homestead. The courts decided in favor of plaintiff, and defendant thereby lost some $500 of his loan. At the succession sale he became the purchaser of the property, and plaintiff continued to occupy it as his tenant. This continued for a space of one year and a half, until he sold the property, and notified her to vacate. She did so, moving into a house acquired by her through one of the homestead associations. The purchaser of the vacated house, when he went to take possession, found that a number of things were missing which he had seen in and about the house at the time he inspected the premises with a view to purchasing; an awning, and some hooks and locks, and some shrubbery had been removed; also the water had been cut off. He complained of this to the defendant, and defendant says that it was to get plaintiff to go to the waterworks company, and have the water restored, that he called at her house on the occasion of the trouble. The subscription for the water had been paid for by the defendant, but had been taken out in plaintiff's name, in order to get a lower rate. Plaintiff deemed it proper to notify the waterworks company of her removal, and did so, and thereupon the company shut off the water, although the subscription had yet some time to run. Defendant suspected plaintiff of having had the water transferred to her new premises, and also suspected plaintiff of being the person who had abstracted the missing things from the vacated premises. Doubtless, it was the addition of these fancied grievances to his old grievance of the loss of the $500 that provoked defendant's outburst. His counsel urges in mitigation of damages that these grievances were not imaginary, but were founded in fact. We do not so find. Plaintiff had as good a right to her $1,000 homestead as defendant to his $2,000 mortgage claim, and defendant's suspicions of her wrongdoing were based upon circumstances entirely insufficient to justify, or even excuse, them. Defendant's outrageous conduct was unprovoked, and utterly unjustifiable.

About half an hour after he had left plaintiff's house he returned for the purpose of getting from her an order to the waterworks company to restore the water connection. She had in the meantime gone to see her lawyer, and only her mother and sister were in the house. Defendant claims that plaintiff's mother set upon him, and called him a s—— of a b——, and attempted to strike him with a chair, and did actually scratch his face. He himself does not testify to the use of this vile epithet, but an Italian, who accompanied him (the same who had bought his house, and had complained to him of the abstraction of the locks, awning, etc.), asserts on the witness stand that the epithet was used and the assault and battery committed. We have no doubt that the old lady gave defendant a warm reception, but we do not believe the epithet was used. Had it been, defendant would not have let the opportunity slip of testifying to the fact. This Italian understood and spoke English so imperfectly that his testimony had to be taken through an interpreter. It is not impossible that his saying the old lady used the epithet was merely his way of saying that she spoke angrily, and that his vocabulary, more than his untruthfulness, is to blame for the statement. Be that as it may, we repeat we do not believe the expression was used. The purpose of defendant in offering the testimony was to establish that the plaintiff

belongs to a low class of people, accustomed to such language and scenes as he treated her to, and not likely to be much shocked or offended thereby. As just stated, we do not believe the old lady made use of the expression in question; nor do we see that the fact of her having given to the defendant the warm reception he describes would necessarily show that she and her family were low, vulgar people, upon whom such conduct as that he rendered himself guilty of would make no impression.

Coming to the question of the amount of damages. In the case of Poissenot v. Reuther, 51 La. Ann. 968, 25 South. 938, the court said: "Defendant was angry and annoyed, but it is no excuse for abusing plaintiff, and calling him a thief." Again, in the case of Bonnin v. Elliott, 19 La. Ann. 322, the court said: "It is true the defendant gave vent to a sudden burst of passion, but there was nothing in the language or conduct of the plaintiff on the occasion to elicit or excuse it."

The judge a quo allowed $50 damages. If he believed the plaintiff, her son, and sister, this was not enough; if he did not believe them, it was too much. The fact that the slander was spoken in the presence of plaintiff's family, and not of strangers, seems to have been looked upon by the learned judge a quo in the light of a mitigation. In our opinion, it was the reverse; it was an aggravation. To charge a mother, in the presence of her 16 year old son with being a thief, has about it something shocking and revolting that does not accompany the same act in the presence of mere strangers. Plaintiff is entitled to substantial damages. As was said by this court in the case of Simpson v. Robinson, 104 La. 180, 28 South. 908, "When plaintiff appealed to the courts against slander and abuse, his case being made out, he was entitled to substantial redress." See, also, Miller v. Holstein, 16 La. 398; Miller v. Roy, 10 La. Ann. 231; Cook v. Tardos, 6 La. Ann. 779; Bonnin v. Elliott, 19 La. Ann. 322; Mohrman v. Ohse, 17 La. Ann. 64; Dufort v. Abadie, 23 La. Ann. 280; Williams v. McManus, 38 La. Ann. 161, 58 Am. Rep. 171; Savoie v. Scanlan, 43 La. Ann. 967, 9 South. 916, 26 Am. St. Rep. 200; Caspar v. Prosdame, 46 La. Ann. 36, 14 South. 317; Harris v. Minvielle, 48 La.

Ann. 908, 19 South. 925; Poissenot v. Reuther, 51 La. Ann. 965, 25 South. 937. The defendant is a man of considerable means.

The judgment of the lower court is amended so as to increase the amount allowed to $500, and, as thus increased, is affirmed.