. The opinion of the court was delivered by
Watkins, J.
This is a suit for the recovery of ten thousand dollars damages for slander and defamation of character, and from the verdict of a jury in favor of the defendant and a judgment thereon based, the plaintiff has appealed.
The following are, substantially, the grounds of plaintiff’s action, to-wit:
That he is and has been a public merchant engaged in business in the town of Jeanerette, in the parish of Iberia, and upon the income *909 of his business he is, exclusively, dependent for the maintenance of himself and family.
That his character has always been of the best, his social standing: good and irreproachable, and his rating as a merchant solvent, undoubted and honorable; and that his success in business was and is dependent upon his standing and character in the community in which he lives.
That he has been for very many years a member of the Masonic fraternity in good standing.
That the defendant did, upon the public streets of said town of Jeanerette, during the month of February, 1895, “unlawfully, wantonly, maliciously and without probable cause, defame and publicly slander your petitioner by openly declaring to Fred. Ansley, in the presence of John T. White and Leo Frank, that your petitioner was a ‘ c — k s — r,’ and that he could prove it.”
That on or about the 5th of February, 1895, the defendant did, on the streets of said town of Jeanerette, publicly proclaim said slanderous and defamatory statement, in the presence and hearing of J. W. Redmond, George W. Whitworth and many others — accompanying such “untruthful slander with abusive and violent language, cursing and maligning him without cause.”
That the slanders thus publicly proclaimed by the defendant as above set forth, “have caused his friends, the members of the Masonic fraternity, the community in which he lives, and the general public to doubt his virtue, his manhood, and his honor; to ostracize his motherless children, to view him as a Pariah — a thing of disgusting infamy — thereby causing him heavy, permanent and irredeemable pecuniary loss, damaging his business reputation, and causing him deep mortification, annoyance and mental anguish.”
Petitioner shows that the iniquity of the charges herein has become so publicly notorious that the State (of Louisiana), in the furtherance of justice and good morals, has criminally indicted (the defendant) for maliciously slandering him;” and in proof of this averment he annexes the bill of indictment to his petition.
He claims of the defendant the sum of two thousand five hundred dollars for the actual loss and damage he has suffered by direct injury to his commercial business through the instrumentality of the slander thus circulated; and the further sum of seven thousand five hundred dollars by reason of the mortification, annoyance, public *910 contempt and odium'it has occasioned him, as well as the social ostracism it has occasioned his family.
For answer the defendant avers that he is not the author of the reports which are charged in plaintiff’s petition as coming from him; but that these were current reports in the town of Jeanerette; and that whatever he did say relative thereto was said to a committee of the Masonic fraternity who were investigating the aforesaid charges, at the instance and solicitation of the plaintiff, who is a member of said organization, submitting to its rules and regulations.
He avers that the aforesaid communications were and are of a privileged nature; and whatever other remarks he may have made upon the subject at issue were made in answer to questions propounded by the plaintiff to him.
On these issues the parties went to trial, and the following is a fair 'summary of the evidence which is disclosed by the record, viz.:
John Redmond, the leading and principal witness for the plaintiff states, that the defendant told him, in February, 1895, that the plaintiff was a e-k-s-r, and gave him the names of the parties who furnished him that information. This conversation took place on one of the principal streets of Jeanerette, near Ur. McGowan’s drug store.
That defendant came to him (witness) and made this statement confidentially, and requested him to say nothing about it. That he said he knew nothing, positively, but had heard it from certain persons whose names he gave — that of Abner Smith being the only one whose name he could recall; though he said they were all negroes.
This witness said that he had lived in Jeanerette for some time, but had never heard of this charge against plaintiff prior to that interview.
Another witness states that he has resided in Jeanerette for eighteen years, and has known the plaintiff for fifteen years, but had never heard of the charge against him until February, 1895. That he had not heard the defendant make the statement, but had heard that he had made it in a public manner. That Mr. Redmond was the first person from whom he had heard anything of the affair; but that soon afterward “every one was talking about it;” that it “ took immediate circulation.”
Being requested to mention the names of some of the persons he *911 had heard speaking of it, he said “ there were so many of them that he could not recall even a few of them, but he gave the name of Leo Frank.
He states that, up to the time of this disclosure, plaintiff’s reputation had been good, and that he had been several times elected a member of the Oity Council of Jeanerette, and that he had stood well with the people of the parish in local politics. That he had always appeared to be a fairly successful man in business enterprises. That his credit and social . standing had been good, but “ since the circulation of these rumors plaintiff and his family had been almost wholly ostracized.”
Leo Frank — the witness named above — says he has resided in Jeanerette for the past eight years, and has known both the parties to this suit during that time. That the defendant had said to him that he had heard the aforesaid charges against the plaintiff. He said that plaintiff’s social standing and character were good up to the time, this report was put in circulation in February, 1895. That same had considerable effect upon him “ for the worse.”
He said that he had first heard the report from Mr. Redmond, but that soon after, so many persons were talking about it that he could not remember their names. That the defendant told him that from all the reports he had heard, and from all the rumors, he believed the charge to be true, and made this declaration publicly. He further states that when this rumor was put in circulation, an informal committee of Masons began to investigate the matter, and that it was subsequently that the defendant spoke to him about it, but that he obtained his information from Mr. Redmon l prior to the organization of this informal committee.
Another witness says he heard the defendant affirm his belief in these charges against the plaintiff upon information he had received. That he heard him make this statement in several different places and in the presence of several different persons.
Another witness states that the day after the meeting of the informal committee a colloquy occurred between the plaintiff and the defendant in reference to the charges which had been put in circulation. That the plain iff “in a tone of wrath began to denounce the defendant, accusing him of starting these reports upon him and demanding retraction. The defendant said he did not originate *912 these reports, but that he believed every word of them, and that the plaintiff ought to be drummed out of the community and despised by every decent man.”
In other respects the statement of this witness is similar in import to that of other witnesses, and they all agree that subsequently a formal committee of investigation was appointed by the Masonic Lodge of the town of Jeanerette, upon its own motion, and not at the suggestion or request of plaintiff, notwithstanding he was a member of that organization.
They concur in the statement that Abner Smith and the other negroes who were mentioned by the defendant as the persons from whom he had derived the information, on the faith of which he had made the confidential communication to Mr. Redmond, had been produced before that committee and had made a statement to them..
At the conclusion of the plaintiff’s testimony by other witnesses,, the plaintiff was, himself, placed upon the witness stand; and in the course of his evidence he emphatically and circumstantially denied the aforesaid charges, and affirmed his entire innocence of them. He says that the circulation of the rumor commenced with Mr. Red - mond. That he never heard of it before, or as coming from any other source.
In other respects, this witness corroborates the averments of his petition, and supports his allegations of injury and damage at the hands of the defendant. In this his testimony is supported by that of his other witnesses.
But, as a matter of fact, is it true, that the alleged slanderous and defamatory statements of the defendant were made to the committee of the Masonic fraternity, as he avers in his answer.
Circumstantially, this statement is contradicted by several witnesses ; and from the testimony of another leading witness we quote the following, viz.:
“Q. Did you, as a member of the informal committee, or as a member of the regular committee, have the defendant before you?
“A. No, sir.
“Q,. Did he ever appear as a witness, or in any other capacity, before either committee?
“A. He did not.
“Q. Was he in the neighborhood, or was he close enough to the *913 deliberations of the committee, that you could have heard, as a member of that committee, what he said, if anything he did say?
“A. No, sir.”
The foregoing statement, and the result of the committee’s investigation, completely sets that pretension at rest, and the sequel is illustrated by a criminal indictment which was found against the defendant on that account.
The trend of the defendant’s evidence is to show that a similar rumor to the one recently circulated was extant several years ago; but [same was traced directly to the man Abner Smith and two or three other negroes, of whom nothing was affirmed by defendant’s witnesses except their hearsay declarations. Neither of these parties were.produced by the defendant as his witnesses.
One of the defendant’s witnesses — a justice of the peace in the town of Jeanerette — testified that the plaintiff caused Abner Smith to be arrested for criminal libel, and brought before his court for trial; and that he, in the presence and hearing of defendant and a number of persons, went down on his knees and swore to the truth of the charges he had made against the plaintiff — giving the most shocking details.
But strange to say only one of those people could be, or was produced as a witness to affirm the truthfulness of the statement. Yet, on the contrary, Abner Simth was placed on the stand by the plaintiff in rebuttal, and he circumstantially denied the truth of the testimony of the justice of the peace. And one of the defendant’s witnesses who affirmed its truth and made the statement that the plaintiff was present in the justice court and heard the declaration of Abner Smith was flatly contradicted by the plaintiff, who took the stand in rebuttal and said the witness’ statement was “false from beginning to end; ” and that the testimony of both of those witnesses at the criminal trial was entirely different.
But it is a striking and noteworthy fact that the defendant did not take the stand as a witness in his own behalf, and contradict or explain the damaging charges which were brought against him by the witnesses of plaintiff.
The law of slander and defamation of character is plain, unambiguous and of easy application to the evidence adduced.
Odgers, in his treatise on the law of libel and slander, says:
“No man may disparage the reputation of another. Every man has *914 a right to have his good name maintained unimpaired. This right is jus in rem; a right that is absolute and good against the world.
“Words which produce any perceptible injury to the reputation of another are called defamatory; (and) defamatory words, if false, are actionable.
“Words which on the face of them must be injurious to the reputation of the person to whom they refer are clearly defamatory and, if false, are actionable, without proof that any particular damage has followed from their use” (pp. 1 and 18).
The principle adopted by the English courts, and which is announced by Odgers as having received the sanction of American courts as well, is words are actionable as slanderous, “whenever they sound to the disreputation of the person of whom they were spoken.” Button vs. Hayward, 8 Mod. 24.
That the charge preferred against the plaintiff comes clearly within that principle will not be denied — could not be, under the defendant’s answer — in view of the fact that, under our law and jurisprudence, the courts of this State are not bound by the technical distinctions of the common law, as to words actionable per se and not actionable per se,” etc.
Spotorno vs. Fourichon,40 An. 423; Miller vs. Holstein, 16 La. 389; Daly vs. Van Benthuysen, 3 An. 69; Tresca vs. Maddox, 11 An. 206.
But the defendant seeks to justify himself on the ground that the disclosures he made were privileged because they were made to a public investigating committee and in the interest of the public. The proof shows, however, that this position is untenable in point of fact; and the most that can be said in this behalf is, that some of defendant’s reiterations of the rumor which was so quickly spread abroad were made contemporaneously with the investigation.
Mr. Odgers says:
“It is a defence to an action of libel or slander to prove that the circumstances under which the defamatory words were written or spoken afforded an excuse for their employment. And this is so, even though the words be proved or admitted to be false. Circumstances will afford an excuse for writing or speaking defamatory words whenever the occasion is such as to cast upon the defendant a duty, whether legal or moral, of stating what he honestly believes to be the plaintiff’s character, and of speaking his mind fully and *915 freely concerning him. In such case the occasion is said to be privileged, and the employment of the defamatory words on such priv.ileged occasion is, in the interest of the public, excused” (p. 182).
But that author, in amplifying the doctrine, in treating of the exercise of the qualified privilege, says :
“In less important matters, however, when the interests of the public do not demand that the speaker should be freed from all responsibility, but merely require that he should be protected, so far as he is speaking honestly for the common good; in these the privilege is said not to be absolute but qualified only; and the plaintiff will recover damages in spite of the privilege” if he can prove that the words were not used bona fide, but that the defendant availed himself •of the privileged occasion wilfully and knowingly to defame the plaintiff.” Id., p. 183.
In the first place, the evidence does not bring the defendant within the operation of the privilege; but even if that were doubtful, we are of the opinion that the testimony fairly discloses that the defendant sought to shelter himself under the plea of privilege subsequent to his having both confidentially and publicly put the charge against the plaintiff in circulation.
This is, in the sense of the law, a slander, a defamation of character that is actionable.
But the defendant makes an attempt at justification, on the ground that the charges plaintiff complains of were of longstanding; that he only repeated a rumor, that had been previously circulated by others,
Odgers says:
“Evidence of the truth of the slander or libel is, therefore, inadmissible, unless a justification is pleaded. Evidence of a rumor that the plaintiff had, in fact, committed the offence charged against him, clearly falls short of justification, and is, moreover, objectionable as hearsay.” Id., p. 304.
And another author, in treating of the repetition of slanders originated by others, says:
“Every repetition of a slander originated by a third person is a wilful publication of it, rendering the person so repeating it liable to an action. ‘Tale-bearers are as bad as tale-makers.’ And it is no defence that the speaker did not originate the scandal, but heard of it from another, even though it was a current rumor, and he, in good *916 faith, believed it to be true. Nor is it any defence that the speaker-at the time named the person from whom he had heard the scandal.” Newell on Defamation, Slander and Libel, p. 350.
That author says that it is no answer for a defendant to say: “There was such a story in circulation; I but repeated what I heartl- and had no design to circulate or confirm it.” Id., p. 351.
The text of that treatise is in keeping with the decisions of the highest courts in several of the States.
Por instance, it was said in Kinney vs. McLaughlin, in 71 Massachusetts 3, viz.:
“ The story uttered or repeated by the defendant contained a charge against the plaintiff of a nature to destroy her reputation. It is no answer, in any form, to say that she only repeated the story as she heard it. If it was false and slanderous she must repeat it at-her own peril. There is safety in no other rule. Often the origin of slander can not be traced. If it were, possibly it might be harmless. He who gives it circulation gives it power of mischief. Ic is-the successive repetitions that do the work. A falsehood often repeated gets to be believed.”
See also to the same effect the following cases, viz.: Frank vs. Browly, 112 Ind. 190; Wheeler vs. Shields, 2 Scappe (Ill.) 348; Dale vs. Lyon, 10 Johns (N. Y.) 447; Hastings vs. Stetson, 126 Mass. 329.
We have given this ease special attention and examined it with care, and have reached the conclusion that plaintiff has clearly established the charges his petition prefers against the defendant, and that he is entitled to be compensated in damages.
In such a case as this, the charges made by the defendant are so far-reaching in their consequences and effect that it is a task of great difficulty for a court of justice to place an estimate upon the-damage plaintiff has suffered in consequence of them; but, in our-opinion, the sum of one thousand dollars will be sufficient to punish the defendant, and deter him from publishing libellous statements in the future, though it fall far short of repairing the injury he has done the plaintiff.
It is therefore ordered and decreed that the verdict of the jury and' the judgment of the court thereon based be annulled and reversed; and it is further ordered and decreed that the plaintiff do have and recover of and from the defendant the sum of one thousand dollars, and that he be taxed with the costs of both courts.