The judgment appealed from is affirmed at appellant's costs.

49 So.2d 18

GLADNEY v. DE BRETTON, Sheriff, et al.

No. 39285.

June 30, 1950.

Dissenting Opinion July 20, 1950.

Rehearing Denied Nov. 6, 1950.

Durrett & Hardin, Baton Rouge, for defendant-appellant.

George Mathews, Joseph A. Gladney, Baton Rouge, for appellees.

HAMITER, Justice.

Newman H. deBretton, made a defendant in this cause, is appealing from a judgment condemning him to pay to plaintiff, Joseph A. Gladney, the total sum of $1000. Answering the appeal, plaintiff prays that the award be increased to $6000, the amount originally demanded by him.

In support of the mentioned judgment the trial judge assigned well considered written reasons in which he accurately reviews the pleadings of the respective litigants, clearly sets forth the issues created, and thoroughly analyzes most of the pertinent evidence adduced at the trial. These reasons, which we quote in full, are as follows:

"This is a suit by Joseph A. Gladney, an attorney-at-law, practicing his profession in this parish and state, against Newman H. deBretton, formerly the Sheriff of this parish, and two of his deputies, namely, B. E. Norwood and Jesse L. Zenor, seeking to recover from them jointly and in solido $6,000.00 for damages which he itemizes as follows:

| | |
|---|---|
| Illegal Arrest | $ 200.00 |
| False Imprisonment | 500.00 |
| Assault and Battery | 200.00 |
| Illegal Search | 100.00 |
| Defamation of Character | 5,000.00 |
| Total | $6,000.00 |

"Plaintiff alleges that on or about October 24, 1946, he visited the jail in this parish and state for the purpose of conferring on legal business with one Havard Burton, who was at that time incarcerated in the jail, which is located on the fourth floor of the Courthouse. Plaintiff alleges that in accordance with the rules and regulations pertaining to the jail, he procured a pass from the Sheriff's office on the third floor and presented it to the jailer, Deputy Zenor, in the Parish Jail, requesting that he be allowed to interview the said Burton on legal business, and that Zenor informed him that he had instructions from Sheriff deBretton to search him, whereupon petitioner informed Zenor that the Sheriff would have to have a search warrant from a Judge before searching him; that upon receiving this information Zenor called, by telephone, the Sheriff, informing him that plaintiff refused to be searched without a search warrant. Plaintiff further alleges after this telephone conversation Zenor walked down the hall a short distance and conversed with Norwood, after which Norwood walked over and informed petitioner he was under arrest and instructed Zenor to book him; that thereafter Norwood pushed him into a cell and locked the door and kept him there until Sheriff deBretton came up a few minutes later and searched him and then allowed him to interview his client. Plaintiff also alleges that when he asked the deputies on what charges he was being arrested he was informed that he was being held for investigation, and that he then requested that he be allowed to call his attorneys, but was refused permission to so do.

"The plaintiff further alleges that on the evening of October 24, 1946, that is, the evening of the same day, that Sheriff deBretton, in a telephone conversation with the news office of the Morning Advocate, a local newspaper, said the following:

" 'There are some dangerous prisoners in the jail and I am taking no chances. I wouldn't be surprised at anything Gladney would do, so he will be searched everytime he enters the jail,' that these remarks from the Sheriff were quoted in an article published the following day in the Morning Advocate, a newspaper having a circulation of over 16,000 copies in this parish and state. Based on the above and foregoing allegations the plaintiff seeks to recover the damages itemized above on the grounds that they have caused him considerable damage, particularly as a practicing attorney.

"The defendants filed exceptions of misjoinder on the grounds that it is obvious from the petition that plaintiff has joined different defendants in separate causes of action in the same suit in that he is seeking damages for an alleged illegal arrest, an alleged false imprisonment, an alleged assault and battery, alleged illegal search, and alleged defamation of character, seeking to recover damages in solido for these things without alleging any conspiracy when it is clearly evident that the damages for

defamation are not in any way related to or have any bearing upon the other damages which he seeks. Defendants contended that this was obviously improper cumulation of causes of action under the Code of Practice and the jurisprudence of this state. This Court sustained the exception of misjoinder of parties defendant and dismissed the suit as of nonsuit as to B. E. Norwood and Jesse L. Zenor, on the grounds that it was an improper cumulation of causes of action against defendants seeking to recover in solido for various causes of action which were not connected and for which there was no alleged conspiracy among the various defendants. The suit, therefore, remains only against the defendant, Newman H. deBretton, individually, and in his capacity as Sheriff of the Parish of East Baton Rouge.

"The testimony of the witnesses varies considerably as to exactly what happened in the jail on the morning in question. However, there is no conflict that the Sheriff had, previous to that date, issued instructions to the deputies in charge to search the plaintiff every time he came to interview any of the inmates of the jail. When the plaintiff appeared on the morning in question with a pass to visit the said Havard Burton he was so informed by Deputy Zenor, whereupon the plaintiff told Zenor that if the Sheriff wanted to search him he would have to have a search warrant. Upon being told this Zenor called Sheriff deBretton and informed him what the plaintiff had

said. The Sheriff thereupon instructed Zenor to hold Gladney until he came up. The Sheriff came up a little later and searched plaintiff in one of the cells near the entrance to the jail.

"The conflict in the testimony of the witnesses is as to whether Zenor and Norwood placed the plaintiff under arrest and forced him into a cell and locked him there until the Sheriff came and made the search.

"The plaintiff testified that they did this, as did two of his witnesses, namely, Harold A. Kennedy and Albert Linbeck. Both of these witnesses were prisoners at the time and were sitting on a bench near where the incident took place. Kennedy had been arrested the night before for fighting and was waiting to be released after having pleaded guilty that morning and paying his fine. This witness appeared in person on the trial of the case and told a clear, straight-forward story, and apparently had no interest upon the outcome of this litigation. Linbeck was confined in the Louisiana State Penitentiary at the time of the trial of this case and his testimony was produced by means of a deposition. It suffices to say that both of the witnesses testified substantially in accordance with the plaintiff's allegations and his testimony.

"In addition to these two witnesses the plaintiff took the testimony of one John J. Ryan, of South Portland, Maine, by means of a deposition. He had previously subpoenaed this witness to appear in person under the provisions of Act 326 of 1942, on

the belief that this witness was a resident of the Parish of Orleans. However, by that time the witness had moved to the State of Maine, and thus, his testimony was taken by means of deposition. The plaintiff upon receipt of the deposition apparently was not satisfied with the testimony given therein and he did not offer it in evidence. However, the defendant sought to introduce portions of it in connection with his defense and the Court, on its own motion, ordered all of the testimony to be produced for consideration.

"The witness at the time of the incident in question was an Inspector of prisons for the Federal Government and was officially inspecting the Parish jail on that morning. It appears that he has been connected with prisons most of his life and is presently retired by the Federal Government.

"This witness testified, among other things, the following:

" 'Q. At this time please state from your own knowledge and from what you saw and heard yourself as to what took place in the jail from the time Joseph A. Gladney, attorney-at-law, presented himself to the jailer until he was released from the jail? A. He requested to visit a client. He was refused unless he submitted to a search, which he refused. The Sheriff was called. Mr. Gladney was escorted by the Jailer into a cell which was not in a cell block, but was rather a room intended for female or white juvenile offenders. In approximately 5 minutes, the Sheriff appeared and went into this room. The door was closed. In about approximately 10 minutes both came out and the Sheriff notified the Jailer to allow the attorney to interview his client. The attorney asked me for my name and address.'

"This witness further testified that the plaintiff was not arrested by Norwood or Zenor, that Norwood did not instruct Zenor to book plaintiff and that Zenor did not take plaintiff's name and address and write it down.

"The deputies, Zenor and Norwood, both testified that they did not arrest plaintiff or lock him up. They were positive that plaintiff was put in a cell after the Sheriff arrived on the scene. The Sheriff substantiated them in this portion of their testimony and testified as follows:

" 'Q. You deny that your jailers, Zenor and Norwood, arrested me on that morning up in jail? A. I don't know anything about it. I told them to hold you until I got there, and you were there when I got there, and I searched you. I told them to hold you until I got there and I was there in two minutes time.

" 'Q. What reason did you have for telling them to hold me until you got there? A. I wanted to search you. You know for what reason. You refused to let them search you.

\* \* \* \* \* \*

" 'Q. You deny that your jailer used physical force in pushing me into the cell

and locking me up? A. I don't know anything about it. I wasn't there. It was not my instructions.

" 'Q. You don't know whether they did or not? A. No. I went up there to use physical force.

" 'Q. What is that? A. I went up there for that purpose.

" 'Q. After this incident took place, Mr. Sheriff, didn't Mrs. Margaret Dixon, from the Morning Advocate, call you up and ask you what happened that day? A. Somebody did.

" 'Q. Did you state to that person over the telephone, "There are some dangerous prisoners in the jail. I am taking no chances. I would not be surprised at anything Gladney will do. He will be searched everytime he enters the jail." Did you tell her that? A. She told me you were there making a statement and asked me if I had anything to say.

" 'Q. Are you positive she told you that I was there making a statement? A. That is what she told me, that you were making a statement, and she asked me if I had anything to say. You were trying to get in the press. You know what you were trying to do.

" 'Q. Now, what did you mean by that statement, "There are dangerous prisoners in the jail. I am not taking any chances. I would not be surprised at anything Gladney would do"? A. I don't remember the

exact words. There are always dangerous prisoners in the jail.'

"It is to be noted that the witness, Ryan, testified that the plaintiff was not arrested, but merely escorted into a cell and further, that plaintiff was told that he could not visit his client unless he was searched by the Sheriff. It is clear that as to this latter statement the witness was in error, for none of the other witnesses, either for plaintiff or defendant, mentioned this at all. Since, according to his testimony, it is a rule among a good many of the prisons of which he was familiar to require those visiting prisoners to be searched before making such a visit, it is quite likely that this is what he thought took place. However, in view of there being no testimony by any of the other witnesses to this effect, this Court is certain that in this he was in error.

"The question of whether the Sheriff as the official responsible for the administration of the jail and the discipline and safekeeping of the prisoners thereof, has a right to require attorneys visiting the jail, for the purpose of conferring with those charged with crimes, and incarcerated therein, to submit to search, is not before this Court. As already pointed out by the Sheriff's own testimony, he did not instruct the deputies to inform the plaintiff that unless he submitted to search he could not visit Havard Burton, but he told them to hold him until he came up and that he would then search him himself, and that is

exactly what he did. However, assuming that the Sheriff has the right to require attorneys to undergo a search before visiting with prisoners in the jail, and this Court doubts that he does have this right except in special or unusual circumstances, he certainly does not have the right when an attorney presents himself to visit a prisoner in the jail to hold that attorney there and require him to undergo a search, and he certainly, further, has no right to place him in a cell in the jail for that purpose.

"Regardless of the conflict in the testimony of the various witnesses, the Court believes that based on the testimony of the Sheriff himself and his deputies, it is clear here that when the plaintiff refused to be searched without a search warrant that he was held until the Sheriff came himself and did search him. The Court also believes that the plaintiff has proven by the testimony that he was escorted into a cell and the door closed and he was kept there for a short time against his will. Whether this amounts to arrest or not it seems to this Court to make little difference. The same end is accomplished. It is clear that the Sheriff instructed the deputies to hold the plaintiff, and it is clear that they complied with his instructions, and it is also clear that he was thereupon searched without his consent, and was not given an opportunity to retire from the jail without seeing his client, but was held against his will and searched. If the Sheriff was afraid for the plaintiff to visit one of the prisoners without being searched it would have been very easy and simple for him to have merely told plaintiff that unless he submitted to a search he could not be permitted to visit Burton.

"This Court expresses considerable doubt as to whether a Sheriff has the right to require attorneys to submit to a search before visiting with prisoners incarcerated in the jail except in special or unusual cases, as heretofore stated. He would certainly be within his rights to supervise the visits on such occasions, but it seems to this Court that he would be going rather far to require attorneys, who are officers of the Court, upon every occasion to submit to search before seeing one of the prisoners. However, as heretofore stated, this question is not before the Court. The question before the Court is whether or not a sheriff has the right to hold an attorney who presents himself to visit with a client and to require him to submit to search against his will. It is obvious that the Sheriff does not have any such rights and, also, that he, in the present case, exceeded his rights as an official charged with the responsibility of administration of the jail and supervising the safekeeping of the prisoners and other duties required by law.

"As to the quantum of damages which the plaintiff is entitled to, as a result of this action, on the part of the Sheriff, it would seem to the Court that they would be nominal. There is no evidence that the

plaintiff was hurt physically in any way and he was retained at most not more than ten or fifteen minutes, and thereafter proceeded to interview his client and conduct his business as he had originally intended. It appears to this Court that an award of $250.00 would be ample under the circumstances.

"The next question pertains to the alleged defamation of character. Plaintiff clearly established that the Sheriff did make the statement to Mrs. Dixon which was published to the effect:

" 'There are some dangerous prisoners in the jail. I am taking no chances. I would not be surprised at anything Gladney will do. He will be searched everytime he enters the jail.' "

"A study of the testimony indicates that the record is completely devoid of any justification for such a charge as was made by Mr. deBretton on this occasion. The Court is further of the opinion that such a statement about an attorney is one that would per se damage him to some extent. The Sheriff of the Parish is one of its highest officials and anything he says will be taken as true and correct by many people. Thus although plaintiff has not been able to show any actual damage, nevertheless, he is under the jurisprudence of this state entitled to reimbursement for the damages which are assumed to result but which cannot be measured or proven with exactness. Counsel for the parties have not favored the Court with any authorities indicating

amounts which have been awarded by our Courts in similar cases, but this Court believes that an award of $750.00 would be proper under the circumstances.

"Plaintiff sued defendant both individually and in his official capacity as Sheriff. It appears to this Court that insofar as the illegal action taken by the Sheriff in the jail is concerned, he was acting in his official capacity, but insofar as the statement to the newspapers was concerned, this was outside the scope of his official duties and for this he would be liable only individually.

"For the above and foregoing reasons judgment will be signed in favor of the plaintiff, Joseph A. Gladney, and against the defendant, Newman H. deBretton, in his official capacity in the sum of $250.00, with legal interest thereon from judicial demand until paid, and in favor of the plaintiff, Joseph A. Gladney, and against the defendant, Newman H. deBretton, individually, in the sum of $750.00, with legal interest thereon from judicial demand until paid, plus all costs of this suit."

■ On this appeal the appellant, Mr. deBretton, first urges that the district court erred in overruling his exceptions of misjoinder of causes of action and improper cumulation of causes of action and misjoinder of parties defendant. Under these exceptions counsel take the position, as we understand it, that appellant is being sued improperly on five separate and distinct causes of action as two different persons

or defendants: (1) deBretton, the individual and (2) deBretton, the sheriff. But they cite no authorities to support this position and we are aware of none. Moreover, our appreciation of the pleadings of plaintiff is that he sued Mr. deBretton only as one person, although he cumulated in the suit several causes of action some of which affect appellant in his official capacity while another concerns him individually. This procedure does not appear to be objectionable, particularly since the causes of action tend to the same conclusion and are not contrary or exclusive of each other. See Code of Practice Articles 151 and 152. The exceptions, in our opinion, were correctly overruled.

■ Appellant also assigns error, on the merits of the case, to the district judge's finding of fact (the basis for the $250 award for illegal detention or false imprisonment) that plaintiff was detained against his will and searched. His counsel say that the finding was based largely on the testimony of Albert E. Linbeck which was taken and admitted by deposition and they maintain that such deposition should have been excluded primarily for the reason that the witness was within 100 miles from the court and his personal attendance could be had. Conceding for the sake of argument that Linbeck's testimony in the form taken was inadmissible, the aforequoted written reasons of the judge indicate that he gave little weight to it and that he predicated his factual finding almost wholly on the testimony of Mr. deBretton and his deputies.

■ Additionally, counsel contend that in view of the testimony of plaintiff himself it cannot be correctly concluded as a fact that he was detained against his will. On this point they direct attention to plaintiff's statement that he did not offer to leave the jail when told he would have to be searched; and, to quote from their brief, they argue that, "All plaintiff had to do was to leave, or ask to leave. If he had abandoned his intention to visit Burton, there would have been no occasion whatever for a search." The answer to this contention and argument seems to be, as stated by the trial judge, that plaintiff was afforded no opportunity to leave, or to offer to leave, without seeing his client. As we appreciate the evidence he was not informed that unless he submitted to a search he would be unable to see his client and would have to leave; rather, the testimony of appellant and his deputies clearly shows that he was to be held and searched regardless. Thus, from Deputy Zenor: "* * * the Sheriff said for us to hold you there until he came up." From Deputy Norwood: "* * * the Sheriff had given him (Zenor) orders to search Mr. Gladney when he came to the jail to see a prisoner." From Sheriff deBretton: "* * * You were standing between the desk and the door when I came in. I got you by the arm and walked in (cell) and told the jailer to shut the door.

* * * I (had) told them (the deputies) to hold you until I got there, and you were there when I got there, and I searched you. * * * I wanted to search you. You know for what reason. You refused to let them search you. * * * I went up there to use physical force."

█ It is our opinion, therefore, that the trial judge correctly concluded that an illegal detention or a false imprisonment had been committed and that he properly awarded damages therefor. Also, we agree that a nominal award of $250, as damages resulting from the act, is ample, notwithstanding plaintiff's insistence under his answer to the appeal that it be increased to $1000. Plaintiff was in no manner physically injured and he was not detained longer than ten or fifteen minutes.

█ The final complaint of appellant concerns the damage award against him of $750 for defamation of character. It was based on his comments about plaintiff made to a newspaper reporter and contained in an article appearing in the issue of the Baton Rouge Morning Advocate of date October 25, 1946, the circulation of which was about 12,000. The entire article was as follows:

"Gladney to Sue Sheriff for Illegal Arrest

"A damage suit will be filed against Sheriff Newman H. deBretton and Deputy Sheriff Joseph Norwood, Joe Gladney, local attorney, said last night, charging that

he had been 'illegally arrested, falsely imprisoned and illegally searched.'

"The suit will also bring charges of assault and battery against the two, Gladney said. The attorney, in a statement issued last night, said that the deputy insisted on searching him when he went into the jail to see a client. When he (Gladney) protested, he said, the deputy 'shoved' him into a private cell and called the sheriff.

"deBretton himself searched Gladney, the statement said, while the lawyer insisted that he could not be searched without a warrant.

"deBretton said last night that Gladney had not been arrested, but had been searched in one of the cells. He said that he went into the cell with Gladney at the time, and searched him.

"'There are some dangerous prisoners in the jail,' the sheriff said, 'and I am taking no chances. I wouldn't be surprised at anything Gladney would do, so he will be searched every time he enters the jail.'

"Gladney said that yesterday's events resulted from a written order which was given to the jailers Monday by deBretton to the effect that 'even though Gladney did have to have a pass to get into the jail, that they would have to search Gladney's person, and should Gladney object that the jailer was to throw him in jail and charge him with disturbing the peace.'

"Gladney also said that he was refused permission to call some lawyer friends while he was being held in the jail."

The circumstances surrounding the publishing of the article, as disclosed by the record, were these: During the afternoon of October 24, 1946, a few hours after his having been searched, plaintiff voluntarily went to the newspaper office and related to a reporter his version of the jail incident, announcing at the same time his intention to sue the sheriff for damages. The reasons for his actions, according to plaintiff, were: "The more I thought about it, the more provoked I got about the thing. I knew and realized that if I didn't do something about it myself they would be putting out all kinds of stories, telling falsehoods about what took place, so I thought it would be the proper thing for me to give a statement about what had taken place and what action I intended to take, because of the wrongful treatment I received that morning.'"

Following the interview with plaintiff, a reporter for the newspaper, as is customary, communicated by telephone with Mr. deBretton, informing him of the charges that had been made and soliciting comments.

Appellant does not deny having uttered the published remarks attributed to him. Rather, first, his counsel analyze them and seek to demonstrate that they were inoffensive. To quote from their brief, counsel state:

"deBretton was not giving any fresh news to the reporter in telling her that Gladney had been searched; Gladney himself had already seen to it that this bit of news reached the press. Nor was it a 'scoop' to say that there were some dangerous prisoners in the jail. Gladney's one time client, Burton, apparently wound up in the insane asylum. That the Sheriff was 'taking no chances' could have meant any number of things. deBretton had already told Gladney that he would be searched every time he entered the jail, and presumably Gladney had unburdened himself of that bit of information to the newspaper.

"That leaves the words 'I wouldn't be surprised at anything Gladney would do.' The lower court called this a 'charge.' Is it? Specifically, deBretton made no charge at all against Gladney. A reporter called him and said that Gladney claimed to have been arrested and searched; deBretton verified the search but denied the arrest. Evidently deBretton was then of the belief that Gladney had knowingly misstated a material fact to a newspaper reporter—namely, that Gladney had been arrested. Having been advised that Gladney had, as deBretton believed, given an incorrect statement about the Sheriff's office to a newspaper reporter, is it surprising that deBretton was sufficiently provoked to remark 'I wouldn't be surprised at anything Gladney would do'?

"The trial judge felt, and stated, that such a statement about an attorney 'is one that would per se damage him to some extent.' If that is true, doubtless many prominent attorneys have been per se damaged, for the writer of this brief has heard it said many, many times, about many, many individuals, including attorneys."

When the several clauses of the published comments of appellant are considered independently of each other, as is done by counsel, perhaps no resulting harm therefrom can be concluded. But when considered collectively and contextually, as would be done by the average reader, they appear to be offensive and damaging; they imply that Gladney is the kind of person who, if permitted, might furnish to dangerous prisoners implements usable in effecting a jail break. And the implication compels the conclusion that the remarks of Mr. deBretton were libelous per se and, therefore, are actionable.

■ But appellant's counsel further contend that since plaintiff himself initiated the publication by rushing to the newspaper office and by making the serious charges against Mr. deBretton he cannot recover damages, they invoking in this connection the doctrine of mutual interchange of opprobrious epithets and of abuse as was applied in Fulda v. Caldwell et al., 9 La.Ann. 358, Goldberg v. Dobberton, 46 La.Ann. 1303, 16 So. 192, Bloom v. Crescioni, 109 La. 667, 33 So. 724; Gilardino v. Patorno,

127 La. 255, 53 So. 556, Kenner v. Milner, La.App., 196 So. 535.

This doctrine, in our opinion, is not applicable here. What plaintiff did was only to relate his version of the jail incident to the newspaper reporter, as was his privilege; and in so doing, even though his version might have been inaccurate in some respects, he resorted to no disrespectful remarks or contemptuous abuse—that kind of language which, under the mentioned doctrine, would constitute sufficient provocation for retaliation by the employing of slanderous words.

■ The described actions of plaintiff, however, are to be considered as mitigating circumstances in fixing the quantum of damages. "Utterances against a person while in a state of great excitement, by one who thinks he has been wronged by that person, are not, in law, justifiable, but the circumstances under which they were made may be considered in fixing damages." Simpson v. Robinson, 104 La. 180, 28 So. 908, citing Simons v. Lewis, 51 La.Ann. 327, 25 So. 406, Caspar v. Prosdame, 46 La.Ann. 36, 14 So. 317, Taylor v. Ellington, 46 La.Ann. 371, 15 So. 499. See also Germann, Jr. v. Crescioni, 105 La. 496, 29 So. 968, Philip v. Quenqui, 139 La. 545, 71 So. 800, 132 A. L.R., pages 934 and 938. Mr. deBretton, as shown by the record, entertained no malice toward plaintiff; he uttered the unjustified and defamatory remarks, obviously, in the heat of passion and excitement, thinking that he had been wronged when in-

formed by the reporter of plaintiff's visit to the newspaper office and of the charges made.

Too, the mentioned circumstances, among other possible reasons render inapplicable and indecisive here the damage award of $7500 made recently by this court to an attorney for defamation of character in Kennedy v. Item Company, Inc., 213 La. 347, 34 So.2d 886, in which there were no similar mitigating circumstances, a decision strongly relied on by plaintiff when insisting, under his answer to the appeal, that the award in his favor be increased from $750 to $5000.

 Undoubtedly plaintiff sustained considerable damage by the defamatory remarks, although the amount thereof cannot be determined with exactness. This being true, and in view of the discussed mitigating circumstances, we are unable to conclude that the district court's award of $750 is improper. In fact, we think that it does substantial justice between the parties.

For the reasons assigned the judgment appealed from is affirmed.

PONDER, Justice (dissenting).

In answer to a question by the plaintiff as to why the defendant thought the plaintiff ought to be searched, the defendant testified, viz.: "Because one of your clients showed up with a knife after you came to see him". A sheriff must use every reasonable effort to prevent the escape of prisoners and to prevent them from inflicting injury on others. In performing this duty, he should be accorded considerable latitude.

In view of the fact that the plaintiff went immediately to the press and gave a statement of his version of what occurred and the fact that the defendant's statement was made only in reply, after inquiry by the press, it would appear that the plaintiff initiated the controversy which resulted in mutual interchange of epithets and abuse and the authorities referred to in the majority opinion are applicable. Fulda v. Caldwell et al., 9 La.Ann. 358; Goldberg v. Dobberton, 46 La.Ann. 1303, 16 So. 192; Bloom v. Crescioni, 109 La. 667, 33 So. 724; Gilardino v. Patorno, 127 La. 255, 53 So. 556; and Kenner v. Milner, La.App., 196 So. 535.

Moreover, I believe the trial judge was in error in refusing to allow the defendant to question the plaintiff regarding his activity in the campaign against the defendant for re-election and to question the plaintiff as to a statement that he had purportedly made that "If we win this suit we have deBretton beaten". Any evidence tending to show that the entire transaction was instigated for political purposes, in my opinion, should have been admitted in order that the true situation may have been ascertained.

For the reasons assigned, I respectfully dissent.

MOISE, Justice (dissenting).

This suit strongly illustrates the human equation. The plaintiff is a lawyer and, as such, an officer of the court. The defendant is a sheriff, the keeper of the jail, Rev.St. § 2833, Art. 1385, Louisiana Criminal Code, and also the operator of the prison, a governmental function. Amer. Jur., Vol. 41, Sec. 3, pg. 886. We must judge the cause from the effect and see the necessary connection between the respective acts—not of the one but both— in order to determine the motive. When the Sheriff gave the order that the plaintiff be searched before entering the prison, this seems to me a matter clearly within the discretion of the keeper of the jail performing a governmental function and therefore the court must not substitute its discretion for that of the discretion of the administrative officer. After the Sheriff arrived at the jail, Mr. Gladney, the plaintiff, was searched. Gladney thereafter saw his client and accomplished the purpose of his mission. But, after leaving the jail, he went immediately to the newspaper office. This newspaper publicized what Mr. Gladney told the publishers, who, thereafter, contacted the sheriff, and they published what the sheriff allegedly told them. Mr. deBretton is a Sheriff, not a newspaper. There could not be any imputation of malice by publication. The authorities in newspaper cases do not apply. Mr. Gladney sought the publication by visiting the newspaper and complaining —the Sheriff did not inspire the publication nor seek it, he was sought by the newspaper. At the time of the utterance, no eye had seen the words, no ear had heard them except the newspaper reporter over the phone. The alleged defamation was not therefore public. To recover damages a litigant must be free of fault. He cannot avail himself of a condition for the enhancement or the granting of damages by a Court where he was instrumental in producing them. It does occur to the author of this dissent that this cause should be remanded to the district court to receive the evidence which was sought to be introduced but was excluded, particularly that evidence which would give an insight on the motives of not the one but of both. The majority opinion was written by the exercise of energy and commendable care but, nevertheless, I feel that we need additional facts, for then we can sound the litigants' hearts by the plummets we apply to our own.

I respectfully dissent.

FOURNET, Chief Justice (dissenting).

In the first place, I cannot subscribe to that part of the majority opinion expressing doubt as to the right of a sheriff, who is charged with the responsibility of the administration of the jail and the discipline and safe-keeping of the prisoners therein, to adopt rules and regulations requiring all persons visiting the jail, whether they be attorneys or not, to submit to search. Of

course, by this I do not mean to imply that the sheriff has a right to search such parties without their consent, except with a search warrant.

However, this presents only an insignificant issue in the case, for the plaintiff himself says that if the illegal search alone was involved he probably would not have gone to the newspapers or filed a suit, expressing his opinion thusly: "I would probably have had no lawsuit." He says it was the fact that he was *illegally arrested* and *locked up,* a fact that is not, in my opinion, satisfactorily established by the record, that caused him to feel he had been damaged.

Nor can I subscribe to the meager amount awarded the plaintiff *if* the statement attributed to the sheriff is one that would per se damage the reputation of a practicing attorney, as held by the majority opinion, for the right to enjoy a reputation, unassailed, has been recognized to be an invaluable right and accorded the same dignity as man's right to due process of law in the protection of his life, liberty, and property, Kennedy v. Item Co., Inc., 213 La. 347, 34 So.2d 886; 36 C.J. 1148, § 11, 53 C.J.S., Libel and Slander, § 4, and this is particularly true with respect to the right of professional men to maintain their vocational standing free from prejudice and injury. Kennedy v. Item Co. Inc., supra; 36 C.J. 1184, § 79, 53 C.J.S., Libel and Slander, § 38; 33 Am. Jur. 88, Section 76.

The conclusion in the majority opinion that the remarks of the defendant deBretton were *"libelous per se,"* was obviously arrived at under the erroneous assumption that deBretton can be charged with the responsibility of the publication in the Baton Rouge State Times of his oral remarks. (Emphasis added.)

Under our civil law, however, it is immaterial whether the alleged defamation was oral (slanderous) or written (libelous), if it has produced any preceptible injury to the reputation of the plaintiff. Fellman v. Dreyfous, 47 La.Ann. 907, 17 So. 422; Harris v. Minvielle, 48 La.Ann. 908, 19 So. 925; 36 C.J. 1166, § 29, 53 C.J.S., Libel and Slander, § 14.

The statement attributed to the sheriff makes no specific charge against the plaintiff that might be said to be damaging per se. When read alone this statement is, in itself, susceptible of more than one construction; and when it is read in connection with all of the history of the plaintiff's past hostility toward the sheriff and the information conveyed to the newspaper reporter, it is still susceptible of more than one construction. Only from the innuendo the plaintiff himself reads into the statement can the meaning be imputed to it that the plaintiff claims in his petition caused him damage, and, certainly, such an imputation even cannot be eked out of the statement without the story the plaintiff himself gave to the press and that was published by the State Times.

It therefore follows that in order to determine whether the statement attributed to the sheriff was slanderous in fact, it must be considered in the light of all of the surrounding circumstances, including the many events that led up to the incident that gave rise to the publication. Some of these are set out in the plaintiff's petition as the motive for the sheriff's action and statement. They are: The Plaintiff had (1) in November of 1939 charged the sheriff in affidavits presented to the grand jury with having illegally used labor and materials belonging to the state for the improvement of his personal property (a charge from which the grand jury entirely exonerated the sheriff); (2) in April of 1946 he instituted proceedings to enjoin the sheriff from enforcing certain rules with respect to the management of the jail the plaintiff felt were illegal (this suit was unsuccessful); and (3) in September of 1946 he (unsuccessfully) sought to obtain a court order to compel the sheriff to feed a prisoner allegedly placed on a bread and water diet by him. In addition, the record further reveals the plaintiff was then seeking the defeat of the sheriff for re-election and was, in fact, the campaign manager for one of the sheriff's opponents.

All of these facts when taken into consideration, particularly if fully explored, might well lead to the ultimate conclusion that the plaintiff in going to the newspaper with the story that brought about the statement attributed to the sheriff did so with the intention of using the story and bringing about the defeat of the sheriff in his campaign for re-election, and that this suit was not brought so much with the hope of recovering damages as with the desire to accomplish just that end.

It is my opinion, therefore, that the case should be remanded to the lower court for the introduction of testimony with respect to the plaintiff's activities against the defendant that the trial judge erroneously excluded. Such testimony should have been admitted for the purpose of further developing facts that would not only have thrown light on the alleged slander as a whole but was clearly admissible for the purpose of establishing the extent to which the damage contended by the plaintiff was brought about by his own actions.

For these reasons I respectfully dissent.