JOE R. VIDRINE, Judge.
The plaintiff, William C. Abraham, filed suit in the Civil District Court for the Parish of Orleans, seeking damages from The Boat Center, Inc., Edward Dwyer, a Lieutenant in the Jefferson Parish Sheriff’s Office, William S. Coci, Sheriff of the Parish of Jefferson, and the American Employers Insurance Company, surety on Coci’s official bond.
After trial, the district court awarded damages to the plaintiff in the sum of Seventeen Hundred Fifty ($1750.00) Dollars against all defendants, in solido. The Boat Center Company, Inc. did not appeal from this judgment and it is therefore final as to that defendant. The remaining defendants have appealed.
The facts of the case are succinctly stated in the judgment of the trial court and we quote therefrom:
“Plaintiff William C. Abraham, a New Orleans contractor of moderate means purchased a new outboard boat engine from Boat Center at its place of business on Veterans Highway in Jefferson Parish on Saturday, July 11, 1959. He gave a check for Three Hundred ($300.00) Dollars on his account in the Gentilly Branch of the Whitney National Bank for the down payment. The bank records show that plaintiff did not actually have that much money in his account on that particular date, though he testified that he did not know this; and the evidence shows that on previous occasions he had 'overdrawn’ but the bank had honored his checks nevertheless.
“The next day, July 12, 1959, a Sunday, plaintiff and his sons tested the engine on Lake Pontchartrain. It gave trouble and they concluded that it was defective.
“On the succeeding day, July 13th, a Monday, plaintiff entered a stop payment order at his bank. On July 15th, a Wednesday, plaintiff went to the Boat Center establishment and executed a note and chattel mortgage for the credit portion of the purchase price and voluntarily returned the engine for repairs.
“Boat Center kept the engine a couple of days; then Boat Center’s president, plaintiff and his two sons, proceeded to *25 operate the engine on Lake Pontchartrain. It functioned satisfactorily. This was either Friday July 17th or Saturday July 18th.
“Plaintiff offered in the presence of his sons to then and there make good the Three Hundred ($300.00) Dollars check on which payment was stopped by giving Boat Center’s president, Mr. Hankins, a check plus the difference in cash. There is a dispute as to how much cash was offered, hut all parties agreed in their testimony that Boat Center’s president was piqued and refused to take payment through the medium offered wanting 'no more of plaintiff’s checks’, and stating that plaintiff would have to come to the Boat Center office and pay cash.
“On July 20, 1959, Boat Center’s president and its attorney proceeded to the Sheriff’s Office of the Parish of Jefferson and discussed with Lieutenant (now Captain) Dwyer’s stenographer the facts surrounding the giving of the check and stopping payment thereon on the part of plaintiff. They left the check with the stenographer to he delivered to Captain Dwyer with the request that he call them.
% * % ifc %
“The Court now comes to July 22, 1959, a Wednesday, when Boat Center’s representatives contacted plaintiff and accepted from him cash and checks in the amount of Three Hundred ($300.00) Dollars. Plaintiff proceeded to the Boat Center office on July 23rd and obtained a receipt. In fact, during all the times involved, plaintiff and Boat Center appear to have been in frequent contact with each other; plaintiff’s address was well known and Boat Center was familiar with the fact that plaintiff was working on a construction job some eight (8) blocks from Boat Center’s office.
“On July 27, 1959, a Monday, one week after the lodging of the complaint, Captain Dwyer called plaintiff’s bank and ascertained that he did not have on July 11, 1959 sufficient funds to cover the Three Hundred ($300.00) Dollars check. He further ascertained that a William Abraham had been charged (not convicted) thirteen (13) years earlier of some offense in New Orleans. Incidentally, this proved to be another person than plaintiff.
“Captain Dwyer informed the New Orleans Police Department that he desired their cooperation in arresting plaintiff. After going to plaintiff’s house once when he was away, plaintiff was arrested by two New Orleans patrolmen in the afternoon, taken to the Fifth Precinct Station, and kept there about two (2) hours. He was then taken to the Gretna courthouse and detained another three (3) hours during which he was refused the opportunity to contact Boat Center.
“Plaintiff’s ultimate release came about most significantly when Captain Dwyer communicated with Boat Center and immediately ordered the release of plaintiff when he found out that ‘restitution’ had been made. It is appropriate to observe that all zeal for the prosecution of plaintiff evaporated when it became certain that plaintiff had squared his monetary accounts.
“When plaintiff was arrested, he was not allowed to remove the tools from his unlocked car. They were stolen and he immediately lodged a protest and obtained an investigation by the police. The tools were never returned. Plaintiff testified, and was corroborated by a Mr. Christmas, that a contract he had lined up (but not signed) with a TV store was given to another when it was learned that plaintiff had been arrested.
“The genesis of the entire sequence of events surrounding the arrest and detention of plaintiff is La. (LSA) R.S. 14:71, paragraph 1, which reads as follows:
“ ‘Issuing worthless checks is the issuing in exchange for anything of value, with intent to defraud, of any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has not suffi *26 cient credit with the hank or other depository for the payment of such check,draft or order in full upon its presentation.’
“It is conceded that a person who commits a crime under this act is guilty of a felony, as punishment can be at hard labor La. (LSA) R.S. 14:2.
“The significant words are those which are underscored namely, ‘with intent to defraud’ and ‘knowing at the time’.
“It requires no great effort for the Court to conclude that the record is devoid of any proof that plaintiff intended to defraud, and it is impossible to believe, therefore, that plaintiff could have been convicted of a crime under La. (LSA) R.S. 13 :71.
“There is no proof that plaintiff knew he lacked sufficient funds in his account, though he candidly admitted that he would not have been sure as to just how much he did have on deposit. He stated that he never gave it a thought as he had money in the bank and no reason to fear that the bank would turn down his check. Consequently, he could not have reasonably anticipated any loss to Boat Center. This represents a common condition and standard operating procedure in the ordinary business life of America.”
A significant fact in this case with reference to the liability of appellant, Edward Dwyer, a Deputy Sheriff with full power and authority to arrest in proper cases, is the fact that all of this transpired without any one ever having filed an affidavit for a warrant of arrest, nor was a warrant used. With reference thereto the trial court had this to say, which we adopt as our own:
“Insofar as the liability of Captain Dwyer is concerned, the Court is well aware of the fact that a peace officer may arrest without a warrant under such circumstances as are spelled out carefully in the Criminal Code and particularly the applicable section thereof, being paragraph (4) of La. (LSA) R.S. IS :60 which reads as follows i
“ ‘When he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that such person has committed it.’
“The court is bearing in mind also that peace officers should not be endangered and hampered in the performance of their duties, as it pointed out in Martin v. Cappel, 160 La. 21, 106 So. 660 where the following appears from the syllabus:
“ ‘Those who seek the enforcement of law in the administration of justice, and who are supported by circumstances sufficiently strong to warrant a cautious, man, in the belief that parties suspected may be guilty of the offense charged, should not be made unduly apprehensive that they will be held answerable in damages. Lyons v. Carroll, 107 La. 471, 31 So. 760.’
“The normal procedure for a peace officer to follow — a matter of common knowledge — is to obtain the issuance of a warrant. La. (LSA) R.S. 15:59 reads as follows :
“ ‘Except as otherwise provided in this Part, no arrest can legally be made, except in obedience to a legal warrant.’
“A mere glance at La. (LSA) R.S. 15 :60 reveals that the exceptions to the requirement of a warrant are designed to take care of cases where expeditious handling is required, such as, for instance, when the crime has been committed in the presence of the peace officer or another officer holds a warrant for the arrest and communicates with the peace officer by telegram or letter. The sole inquiry here is whether Captain Dwyer had under all circumstances 'reasonable cause’ to believe (1) that a felony had been committed and (2) that plaintiff was the culprit.
“The court is of the opinion that the admitted facts failed to justify such beliefs *27 ■on defendant Dwyer’s part; and that, all things considered, he was negligent in obtaining the arrest and detention of plaintiff.
“In the first place, Boat Center’s president was a complete stranger to Captain Dwyer and his stenographer; yet on his oral statement alone made to a stenographer, defendant Dwyer skipped the normal formality of requiring that a warrant be sworn out which would have been a simple matter. There was no need for prompt action. In fact, a week elapsed in which Captain Dwyer neither heard anything further from the complaint nor took any action himself. The normal prudent course, (as a possible substitute for obtaining a warrant) would have been to check with Boat Center in view of the fact that its officials were readily available and yet had seen fit to let the entire matter lie dormant for a week. The amount involved was small — $300.00—and no reason to fear the escape of plaintiff presented itself.
“The Court cannot help but note that Captain Dwyer did communicate with Boat Center but this was after the arrest of plaintiff, and on its say-so alone that ‘restitution’ had been made, the Captain released plaintiff and dropped everything (though according to the Captain, he had entertained a genuine belief that plaintiff was guilty of a felony, as he had ascertained that a William Abraham (not plaintiff) had had police trouble and also that plaintiff did not have Three Hundred ($300.00) Dollars on deposit on July 11, 1959.)
“The record is clear that plaintiff’s release was not based on the fact that his innocence had been established, but because he had paid up.
“The doctrine of Janes v. Wilson, 119 La. 491, 44 So. 275 is applicable here. Even though a robbery had actually been committed in Winnfield and the complaining witness had reasonable grounds to believe Janes had committed it, the Supreme Court held the town Marshall of Ruston in damages when he arrested plaintiff at the railroad station on nothing but a telegram from the complaining witness. The following language is all expressive:
“ ‘But they acted without warrant of law, and must pay the penalty. The liberty of the citizen, even of the humblest, is sacred, and especially, must the citizen not be subjected to the indignity of a chain without due warrant of law.’
“See also Guilbeau v. Tate, et al [La. App.], 94 So.2d 896; Martin v. Magee, 182 La. 263, 161 So. 604; Brown v. Dawkins, 2 La.App. 213 and Smith v. Dulion, 113 La. 882, 37 So. 864.
“In Wells v. Johnson [Johnston], 52 La.Ann 713, 27 So. 185, the following significant language appears:
“ ‘We are of the opinion that a Louisiana Sheriff, applied to arrest and imprison a person as having committed a crime in another state, should, before taking action, require the applicant to conform to the requirements of section 1038 of the Revised Statutes, by making the affidavit therein referred to, and causing the warrant therein provided for to be issued. It is true that the necessity of even that situation might throw upon the Sheriff the onus of arresting, for the purpose of an examination, the person designated in the warrant; but the risk, under such circumstances, would be legally imposed, and not a self-assumed responsibility, and would be tested, as to results, by that fact. We do not mean to say that exceptional cases might not occur, which, from their special features, would justify a Sheriff in departing from this cotirse but the present is not one of such cases. We are of the opinion that there were no reasonable grounds in this case for summarily arresting and imprisoning the plaintiff at the instance of Broadway, upon the mere suspicion which he entertained as to the plaintiff and Ben Franklin being one and the same person. He con *28 fessedly had never seen him, and, even if he had knowledge of any facts on which such a suspicion rested, they do not seem to have been communicated to either the sheriff or his deputy. The whole matter seems to have been recklessly turned over to the judgment of Broadway, upon whose nod the Sheriff acted.’ ” (Emphasis supplied)
The trial court found Edward Dwyer liable for damages and awarded judgment accordingly.[1] We cannot find any error in the trial court’s holding.
We next consider the question of quantum. The appellee claims damages for the loss of his tools which were stolen; the loss of the profit he would have made on a contract which he was about to enter when arrested, and finally, for humiliation and embarrassment etc. The trial court awarded Seventeen Hundred Fifty and 00/100 ($1750.00) Dollars, however, the damages were not itemized. Therefore, this court will discuss each item of damage separately.
Counsel for appellant argues that even if there is liability appellee did not suffer any damages. He argues that the proof is very negligible with reference to any special damages which he claims. Appellant argues that even if the police refused to permit the appellee to close the trunk of his car to save his tools, appellee’s wife was present and should have closed the trunk. Of course, this argument is answered by the appellee himself when he stated under cross-examination after counsel for appellant established the fact that appellee’s wife was in the house:
“Q. Now is your wife crippled?
“A. No.
“Q. She could see in the car from the back door, is that correct?.
“A. Yes, un huh.
“Q. When you were arrested, you tell you wife to go close the car?
“A. No sir, my wife has been treated by the doctor for heart trouble.
“Q. That’s all. I just asked you if your wife was crippled? You said no.
“A. I wouldn’t call her an invalid, but she sure couldn’t carry tools because she has been treated now for 15 years.”
The evidence indicates that the tools lost by the appellee were valued at Eight Hundred ($800.00) Dollars. However, it is also in evidence that these tools had been used and, therefore, had depreciated.. We think that Five Hundred ($500.00) Dollars for the loss of the tools would do justice to both parties.
Appellant further argues that the damage claimed by the appellee with reference to a contract is so far remote and speculative that it cannot be claimed as a loss because of this arrest. However, the following testimony was given as a result of questions from the trial judge, after it was established that appellee was to enter into a contract with the witness, Mr. Christmas :
BY THE COURT: (To Mr. Christmas)—
“Q. Would you have given this job to him if he had not called you and told you about his trouble?
“A. Really, your Honor, I think I would have.
“Q. You think you would have? Well you’re not certain about that?
“A. He was lowest estimate.
“Q. He was lowest estimate?
“A. Well, if he was coming that evening to see me about the job, I probably would have signed whatever agreement I’d have to sign with him, *29 but after hearing from him I decided not to let him have the job.”
The evidence indicates that the contract price was Two Thousand Five Hundred ($2,500.00) Dollars. The appellee testified that out of the Two Thousand Five Hundred ($2,500.00) Dollars, One Thousand ($1,000.00) Dollars would have to be paid for materials and the remaining Fifteen Hundred ($1500.00) Dollars would go for the labor necessary to complete the job. The appellee testified that he and two other men would do the work. Therefore, we think that the sum of Five Hundred ($500.-00) Dollars for the loss of profit on this contract is justified.
Appellant argues further that the fact that he was arrested and kept under arrest for a period of five (5) hours doesn’t necessarily mean that he suffered any damage. Appellant argues that the appellee was treated very courteously in this case and the record fails to reveal any humiliation suffered by him. The court cannot close its eyes to the fact that the appellee was under arrest and his liberty was taken away from him. The fact that he was not mistreated does not necessarily mean that he was not humiliated. The court cannot conceive of a business man being arrested under the circumstances which prevailed in this case without suffering humiliation and embarrassment.
While the trial court did not itemize the damages awarded, it did rely on the authority of Barrios v. Yoars, La.App., 184 So. 212; Gladney v. De Bretton, 218 La. 296, 49 So.2d 18 and Thomas v. Henderson, 125 La. 292, 51 So. 202. We think these cases justify an award in this case of Seven Hundred Fifty ($750.00) Dollars for humiliation and embarrassment suffered by the appellee.
Therefore, for the above reasons, the judgment of the trial court is affirmed. All costs to be paid by the appellants.
Affirmed.
Rehearing denied; MILLER, J., dissents.

. Under LSA-R.S. 33:1443, Sheriff Coci and his bondsman were also held liable.