Plaintiff sued the Department of Conservation, now known as the Department of Wildlife Fisheries of the State of Louisiana, and five individuals, J.V. McConnell, H.O. Warren, Clarence Hood, Joe Singer and D.L. Farrar, all of whom were agents of said Department, for damages alleged to have resulted from a trespass committed on property of plaintiff. On an exception of no right or cause of action the suit was dismissed as against the Department of Conservation and no appeal has been taken from this action. Exceptions of no cause or no right of action and a plea of estoppel filed on behalf of the individual defendants were overruled and, after trial, there was judgment in favor of plaintiff and against the five named defendants in solido in the principal sum of $466.15, from which judgment defendants have brought this appeal.
Plaintiff is a resident of the town of Chatham, Jackson Parish, Louisiana, where he is engaged in the ice business. He obtained his supply of ice for resale in Monroe, Ouachita Parish, Louisiana, and in making his trips to Monroe for the purpose of hauling ice plaintiff on several occasions noticed two deer that were apparently owned by a Mr. Brown and kept on his property in West Monroe. He entered into negotiations with Mr. Brown for the purchase of the deer and consummated the transaction by paying $50 in cash for the animals, which he then transported to his own premises at Chatham, where he had built a corral on his property immediately adjoining his residence, within which enclosure of some 2 1/2 acres more or less he placed and maintained the deer. These events took place during the summer of 1941 and for several months plaintiff kept the deer in the enclosure prepared for them, which was located on the highway between Chatham and Columbia at a point just outside the town of Chatham. The evidence shows that the deer were well cared for, plaintiff testifying that he fed them about two gallons of shelled corn per day. The animals became pets of the neighbors and town folk of Chatham and there is no evidence that plaintiff had in mind any purpose aside from keeping and maintaining these gentled and domesticated animals as pets. During the month of December, 1941; the defendant, Hood, advised plaintiff that he was violating the law by keeping wild animals without a permit. After inquiry as to the details of applying for a permit plaintiff communicated with the Department of Conservation, by letter, requesting a permit to keep the animals, and in reply thereto received on December 24, 1941, a letter dated December 22, 1941, signed by "Margaret Clinton, Secretary, Division of Wildlife Fisheries" of the Department of Conservation, which acknowledged receipt of plaintiff's request for a permit and advised as follows: "Due to the fact that the Director is out of the office until after the Xmas holidays, it will be impossible to take this matter up with him until his return, about the 4th of January."
Insofar as the record shows, this is the only communication ever directed to or received by plaintiff. But, on January 5, 1942, the five defendants, accompanied by the Sheriff and a Deputy Sheriff of Jackson Parish, visited plaintiff at his residence and informed him that they had been instructed to release the deer. Plaintiff refused to give his consent to the release of the animals which he had purchased and peacefully kept for a number of months, whereupon some of the defendants proceeded to break the lock and an attempt was made to drive the deer out of the enclosure. But it appears that the deer were unwilling to accept the gift of a precarious freedom and they stubbornly refused to leave their home. Baffled by the failure of the wild animals to cooperate with their well-intentioned motives, the posse of agents withdrew from the field. On the following day, while plaintiff was absent from his home for the purpose of consulting an attorney in Jonesboro with respect to his legal rights in the situation, the five agents again returned, broke down the fence and drove the deer out into what must have been for them a strange and rather terrifying world.
These are the facts concerned with the alleged trespass. Plaintiff claimed as damages the sum of $1,250, made up of items *Page 239 
comprehending the purchase price, the cost of feeding and expense of keeping the animals, damages to the fence, mental worry, embarrassment and anxiety, and damages for unlawful entry and trespass.
By way of defense it is urged that plaintiff was guilty of violation of several provisions of Act No. 273 of 1926, Article III, Section 2, as amended, Dart's Statutes, § 2948, specifically in that he purchased, transported and possessed wild game without a permit, and that it was the duty of officers authorized to enforce the law, under the provisions of Section 5 of the article of the Act above set forth, to confiscate the quadrupeds, taken and possessed by plaintiff contrary to the provisions of the Act, and to hold the same subject to disposition by order of the Commission.
[1] Conceding that plaintiff was at least technically guilty of violation of the Act and that the agents of the Department were authorized to take steps for the enforcement of the provisions of the Act in accordance with the terms thereof, it must be pointed out that the issue in this case does not concern either of these points but involves only the nature, manner and methods used, followed and pursued by the enforcement agents. We find no authority in this or any other law applicable to the facts at issue which justifies the character of action taken by these agents, and we observe no provision in Section 8 of Article 1 of Act No. 273 of 1926, which is urged by distinguished counsel for defendants, as authority for this procedure, which even by reasonable inference, much less by express terms, justifies any agent of the Department in taking action of the character starkly revealed by the facts in the instant case. Nor do we find any point in considering the provisions of law relative to the application for and granting of permits for the taking, possession or transportation of wild quadrupeds.
These are all extraneous and irrelevant issues. Granting that plaintiff violated the law, conceding that the Department might reasonably have refused to issue him a permit for keeping the deer, it being shown that plaintiff, only a short time prior to the occurrence of these incidents, had been convicted of killing deer out of season, and admitting the right and authority of agents of the Department to enforce the laws in a proper manner, we are nevertheless deeply impressed with the fact that the methods used in this case and the actions taken were high-handed, arbitrary and violent beyond any need or reason.
Particularly are we confirmed in this view by reason of the established fact that at least one, and perhaps others, of the defendants had taken occasion, prior to the descent en masse upon plaintiff's property, to consult the appointed, sworn and acting Assistant District Attorney in and for the Parish of Jackson of the State of Louisiana. We quote from the testimony of this official, Mr. Wayne Stovall, as follows:
"Also, I advised Mr. Hood that I would not proceed to take Mr. Anders' deer without a court order, even though his department indicated that that was the way it must be done."
* * * * * *
"I couldn't quote the words of that letter, but I do definitely recall that they intimated they were stalling him and in the meantime to take possession of the deer. Mr. Hood's purpose in being in the office was to find out from me whether or not he thought it would be legal for him to go over there and take the deer. My recollection is that I advised him against it."
The letter referred to in the last quoted extract from the testimony of the witness is not in the record and none of the witnesses appeared to recall what had actually happened to the communication in question. But there is ample testimony in the record as to the nature of the letter which had been directed to the defendant, McConnell, the District Supervisor of Game Wardens, by some official of the Department of Conservation, and it is quite clear that this letter informed the addressee that plaintiff, Anders, had applied for a permit to keep his deer, and that he was being "stalled" until the deer could be released by agents of the Department.
This masterpiece of deceit and trickery needs no comment. It is almost inconceivable that any official of any department of *Page 240 
the sovereign State of Louisiana would find it expedient to advise one of its citizens that a reasonable request on his part would be given proper and dignified consideration, and, almost at the same time, give direct orders for the purpose of circumventing the possibility of the granting of such a request.
[2] The only tenable argument that is urged on behalf of defendants in this case deals with the general proposition that public officers, acting in good faith and within the scope of their authority, are not liable in private actions for the execution of the orders of their superiors, which orders are fair and reasonable on their face.
We thoroughly subscribe to the correctness of this statement, but the facts in the case at bar completely destroy any claim to immunity based upon such a proposition, and on the facts this case is clearly distinguishable from Lecourt v. Gaster, 50 La. Ann. 521, 23 So. 463, and Bright v. Murphy, 105 La. 795, 30 So. 145, cited in brief of defendant's counsel.
If the orders received by these agents from their superiors were "fair on their fare", why was it thought necessary to consult the Assistant District Attorney? Why was it necessary or even desirable that five enforcement officers of the Department, which included the District Supervisor for the Division of Wildlife Fisheries, the enforcement officer of said Department for Jackson Parish, an enforcement officer of Lincoln Parish, an enforcement officer of Claiborne Parish, and an enforcement officer of Caddo Parish, should join in the execution of an ordinary, routine matter of enforcement? Why was it necessary for these gentlemen to further fortify themselves with the presence of the Sheriff and a Deputy Sheriff of Jackson Parish on the occasion of their first visit? And, finally, why did they take advantage of the absence of the plaintiff from his home in order to effect the consummation of their orders?
The answers are obvious. The only question that cannot be readily answered by any reasonable process of logical consideration is why a high official of the Department chose to proceed by trickery and double dealing when there was open to him the clear, clean pathway of direct and honest action!
It is evident that an occasion was taken to make of what should have been an ordinary, simple incident of law enforcement a "cause celebre" and as a result, indeed, a mountain has been made of a molehill.
We are not without sympathy for the individual defendants who must, under the facts of this case, suffer a penalty that has not entirely resulted from their own fault. Nevertheless, they are censurable on the ground that they disregarded the sound advice of the official who was consulted, and proceeded forcibly to execute orders which could have been more easily, and certainly more properly, carried out through the ordinary processes of laws which were readily available.
[3] Finally, it is urged on behalf of defendants that their plea of estoppel should be maintained on the ground that plaintiff does not come into court with "clean hands", being guilty of violating the law at the time of the commission of the trespass. We are not impressed with this contention. No evil intent nor wilful violation of law charged to plaintiff has been shown. There is not the slightest evidence that plaintiff was not in good faith in his purchase of the wild quadrupeds, which, had been openly possessed and maintained by another person prior to such purchase, and which he subsequently openly possessed and maintained, for a period of months, without interference and without 'restraint on the part of any of the zealous enforcement officers of the Department. On the contrary, it has been definitely established that as soon as plaintiff was informed that his possession of the animals in question was a violation of the law, he immediately took the necessary steps to comply with the provisions of law and was prevented from such compliance only by the duplicitous actions of the guardians and administrators of the particular law involved. We think it would be going to unreasonable lengths to hold that a citizen cannot complain and cannot proceed for redress of actions of force and violence because, under a strained and strict interpretation, he may be considered to have violated the technical provisions of law. *Page 241 
Our system of government and our theory of law protects and guarantees the rights of even the blackest of criminals against all processes and actions which are in violation of such rights.
No argument has been advanced in this Court by counsel for defendants as to the quantum of damages. An answer to the appeal has been filed by plaintiff praying an increase in the amount of the judgment, but we find no facts which would justify us in disturbing the sum determined by the Trial Court.
For the reasons assigned, the judgment appealed from is affirmed at appellant's cost.