ELLIS, Judge.
The defendants have appealed from a judgment awarding damages to the plaintiff for an alleged trespass, false imprisonment, and mental anguish, humiliation and embarrassment, arising out of the alleged false imprisonment, and the defendant, Honoré Tate, has appealed from a judgment against him individually for damages awarded to plaintiff as the result of an alleged laceration of plaintiff’s forehead, disfigurement as the result of a permanent scar, pain, suffering, mental anguish, humiliation and embarrassment arising out of malicious prosecution, and aggravation of an existent disease.
Plaintiff has answered the appeal and asked that the awards be increased.
The three defendants at the time of the occurrence which resulted in this suit were wild life agents whose authority in this case is governed by LSA-R.S. 56:108. The plaintiff is an ex-representative and sheriff for a number of years of the parish of St. Landry and owned what is referred to in the record as a camp but in reality was a second home, located south of Krotz Springs to the west of the Atchafalaya River and bounded on the south by Bayou Courte Bleau. The property is enclosed on all sides except along the Bayou. It is shown that the plaintiff had every convenience including washing machine, television, etc., that he had in his home in Opelousas, and that he spent almost an equal amount of time at this place as he did at his home in Opelousas.
On July 31, 1953 the plaintiff and three personal and business acquaintances had gone to his place on the bayou for the purpose of eating a fish dinner and discussing a matter of business. Around four o’clock in the evening Wild Life Agents, Tate, Doucet and Rozas were going along the river road which passed plaintiff’s property to investigate a report of illegal rabbit hunting south of plaintiff’s property and in no wise connected with the plaintiff. When they passed the road which lead into plaintiff’s property Agent Tate saw an automobile parked in plaintiff’s yard, whereupon Tate ordered the driver to stop back up and go into plaintiff’s property. It is further shown that there was quite a bit of ill feeling between Tate and the plaintiff as the result of Tate, during his previous service with the Wild Life Division, having gone into the plaintiff’s property when he was sheriff and entertaining a number of his friends, at which time he accused the plaintiff of having violated the law by possession of frog legs which he was cooking for his guests subsequent to the close of the season. The plaintiff denies that there was any violation of the law and it is clear from the record that plaintiff had told Tate not to come back on his property.
At the time these defendant agents went into plaintiff’s property the latter, together with his guests, were sitting in chairs in the yard discussing their contemplated business transaction, and the plaintiff had his back to the defendants. Agent Tat'e inquired something about fishing on which he was informed that they were not fishing, and immediately thereafter the plaintiff saw Tate and asked him what he was doing there and that he did not want him on his property. Tate replied that they were making a routine check and that he did not have to get off of the property, and also said something to the effect that the plain *898 tiff had violated the law before and he was probably still violating it. This infuriated the plaintiff and one word led to another and the plaintiff struck at Agent Tate but missed him and in return was struck over the eye causing a cut that bled very freely. There was quite a bit of excitement and cursing and Tate informed the plaintiff that he was under arrest, to which the plaintiff objected, and Tate told him that he was going to take him if he had to drag him.
Plaintiff’s guests as well as the other two agents with Tate attempted, as soon as they realized seriousness of the situation, to prevent it. Plaintiff’s guests persuaded the agents to allow them to drive with the plaintiff to the court house in Opelousas. Throughout the entire visit and argument and altercation Tate apparently took charge. Nothing was said about the other two agents and the plaintiff very frankly testified that he did not specifically order Agents Doucet and Rozas from his property and would not have done so in any event had Tate not been with them.
While we have numerous briefs and supplemental briefs and a fairly voluminous record, the case does not present any difficult questions, but it did undoubtedly arouse quite a bit of controversy in the parish of St. Landry. The plaintiff was followed by the agents to the court house in Opelousas and into the court house, where they were met by a number of people including the District Attorney of the Parish of St. Landry. Upon seeing the condition of the plaintiff, who, in addition to bleeding freely at the time and ever since he had been struck by Tate, was extremely upset emotionally. Plaintiff was a sufferer from Parkinson disease at the time of the occurrence, and it is shown that people with this affliction are prone to be susceptible to abnormal emotional upsets. The District Attorney immediately ordered the plaintiff’s friends to take him to the hospital, and after a discussion with Agent Tate, who apparently was in charge or took charge of the situation advised the later against making any charges against plaintiff. Tate, however, called up his superior officer and upon the facts as related by the former was advised next day to make a charge against plaintiff for interference with an officer in the performance of his duties. It is further shown that in September 1953 Tate made two more charges against the plaintiff, and the record reveals that Tate was convicted of criminal trespass upon a charge by the plaintiff, and was found guilty of false imprisonment by the District Court.
It is first necessary that we decide whether these agents were acting within the legal authority which is set forth in part in LSA-R.S. 56:108 as follows:
“To secure the effective protection of wild birds and game quadrupeds, the commissioner shall appoint not less than twenty-five wildlife agents'whose entire time shall be, under the direction of the commissioner, devoted to the performance of their official duty under this Sub-part. * * *
“The commissioner, any wild life agent, or any of the various sheriffs, deputy sheriffs, constables, deputy constables, and other police officers of this state may without warrant arrest any person violating the provisions of this Sub-part in his presence or view, and may take such person in custody immediately for examination or trial before any officer or court of competent jurisdiction of this state or of the United States, and may serve and execute any warrant or other process, issued by any officer or court of this state of competent jurisdiction, for the enforcement of the provisions of this Sub-part.-
“The commissioner or any agent may visit or examine, with or without search warrant, any cold storage plant, warehouse, boat, store, car, conveyance, automobile or other vehicle, airplane or other air craft, basket or *899 other receptacle or any place or deposit for wild birds or game quadrupeds, whenever they have probable cause to believe that any provision of this Sub-part has been violated.” * * *
Under the above law, an agent could arrest without a warrant any person violating the provisions “of this Sub-part in his presence or view” and “may visit or examine, with or without search warrant * * any place * * * whenever they have probable cause to believe that any provision of this Sub-part has been violated”. Under the facts in this case there is no testimony that these agents had any probable cause to believe that the law was being violated by the plaintiff or his friends. The primary motive for their mission or trip on this afternoon was to investigate a report of illegal rabbit hunting to the south of plaintiff’s place on the Atchafalaya River. While plaintiff had “No Trespass” signs on his property we believe that the agents could have paid a personal visit and would not be guilty of trespass on this private property unless and until the owner ordered them off, that is, objected to their driving into his property. In other words, the agents could not be held liable in damages for trespass merely because they paid a personal visit to the party’s camp or his home until they were notified to leave and refused. In the present case, however, the facts show that there was ill feeling between Tate and the plaintiff due to a previous visit by Tate during a party at which the plaintiff was entertaining a number of his friends. On that occasion Tate, according to the record, had been told that there was a violation of the law and under the facts we would conclude that on the prior visit he had probable cause, however, on the date in question he had no probable cause to expect a violation of the law and had no right over the objection of the plaintiff to go on the latter’s property with a search warrant. He well knew that plaintiff had ordered him out on the previous visit and had told him never to come back on his property, and if Tate wished to go in his official capacity as an agent he should have obtained the proper legal protection, viz., a search warrant. In addition to the previous episode between Tate and plaintiff, it is shown that Tate lost his job for some 13 months or until there was a change in the administration, evidently as a result of his visit to the plaintiff’s camp with regard to the frog legs. Therefore, there is no doubt as to the ill feeling each had for the other and no doubt but that Tate knew that plaintiff objected to his presence on his property. Under the facts, these agents were in the same status, so to speak, as individuals. They had no search warrant and no testimony in the record to show any probable cause on their part to believe that the law which they were employed to enforce was being violated. The jury evidently believed, and we agree with them, that Tate ordered the driver to back up and go in plaintiff’s property merely to harrass and get even with plaintiff.
Our brethren of the Second Circuit in the recent case of Loe v. Whitman, La.App., 87 So.2d 217, 219, correctly stated the law with regard to personal liability of an officer, as follows:
“It must be recognized, of course, that there is no personal liability on the individual acting strictly pursuant to his public duties when that act is in good faith and without malice, for in such instances the action of the individual becomes merged in the official act. See: Monnier v. Godbold, 1906, 116 La. 165, 40 So. 604, 5 L.R.A.,N.S., 463; Tucker v. Edwards, 1948, 214 La. 560, 38 So.2d 241. Strahan v. Fussell, 1951, 218 La. 682, 50 So.2d 805. On the other hand when the defendant acts outside of his strict authority he breaches the condition of his immunity and is liable to a civil action for damages to persons harmed by his improper conduct. Harper on *900 Torts, sec. 298, p. 668; 2 Shearman and Redfield on Negligence (Rev’d Ed.) sec. 323, p. 792; 2 Elliott on Roads and Streets (4th Ed.) sec. 858, p. 1120; see also David, the Tort Liability of Public Officers, 12 So.Cal.L. Rev. 127, 151; Thibodaux v. Town of Thibodaux, 46 La.Ann. 1528, 16 So. 450; Lecourt v. Gaster, 50 La.Ann. 521, 23 So. 463; Tucker v. Edwards, supra; Anders v. McConnell, La.App., 31 So.2d 237; Strahan v. Fussell, 1951, supra.”
The verdict of the jury and the judgment signed by the court is correct insofar as Tate’s liability is concerned. He was not acting strictly in pursuance of his public duties nor in good faith and without malice, but was acting outside of his strict authority. Tate was clearly a trespasser under the facts in this case. It is argued, however, that the plaintiff attempted to strike the first blow. It appears from the record that this is true, however, when Tate violated the warning of the plaintiff not to come on his property and went there without any search warrant and without probable cause to believe that the law was being violated, he became an ordinary trespasser and the plaintiff had a right to order him off and if he refused to attempt to put him off. Furthermore, Tate was the aggressor in this entire affray for his visit was not only unlawful but inspired by malice and with ill feeling toward the plaintiff, which he well knew would goad the plaintiff into a fury. Counsel for defendant Tate argues that the latter had a right to arrest the plaintiff because he committed a misdemeanor in his presence, presumably because he struck Tate after the latter’s refusal to leave plaintiff’s property and under the theory that he was interfering with an officer in the performance of his duties. Neither ground is tenable under the facts. Tate’s actions convicted him of aggression rather than the plaintiff, and Tate was not acting in the performance of his duties as specified by the law, therefore, the plaintiff was not interfering with an officer in the performance of his duties.
As to the other two officers, we believe that they were innocent victims of Agent Tate’s ill feeling toward the plaintiff. One of these officers did not know of any ill feeling, while the other had heard of it. They were younger officers, that is, did not have the length of service which Tate had enjoyed, and from the record we are convinced that because of this fact they were acting according to Tate’s wishes and orders, and they entered plaintiff’s property without any malice or ill feeling toward the plaintiff but merely as they thought, to pay a visit. The altercation arose so swiftly that they had no time to leave. In fact, they were not ordered to leave and, as previously stated, plaintiff said that he would not have ordered them to leave. Therefore, we do not believe that they were guilty of trespass so as to render them liable for any damages on this score. Rozas and Doucet tried to prevent the disturbance and pleaded with Tate to stop. They at no time told the plaintiff that he was under arrest. Caught in the situation as they were they did drive Tate back in the car and followed the plaintiff to the court house. They made no charges and took no further action against plaintiff and we believe that even though technically guilty of trespass and false imprisonment, in its strictest sense, that plaintiff suffered no damages as the result of their presence. For that reason we believe the verdict of the jury awarding damages against agents Doucet and Rozas was erroneous.
On the question of damages for the laceration of plaintiff’s forehead, the permanent scar, pain, suffering, mental anguish, humiliation and embarrassment, and for malicious prosecution, the evidence reveals that plaintiff suffered a cut in the forehead that necessitated approximately three stitches; that he bled profusely but that the permanent scar is very minor. It *901 is further shown that plaintiff was a man of high standing in the parish of St. Landry, having occupied the position of representative and sheriff for many years and evidently did suffer quite a bit of mental anguish as a result of what he felt to be an absolutely unjust invasion of his rights and was bound to have been humiliated and embarrassed in front of his business acquaintances, friends, and guest9 by Tate’s behavior. As to the acceleration of an existent disease, the record shows that the plaintiff was suffering from a disease which was progressive, and while there is some testimony from plaintiff’s doctor that the occurrence is bound to have affected the disease, at least temporarily, or to have made the plaintiff more nervous, we not believe that the evidence would justify a finding of a permanent aggravation or an acceleration due entirely to the occurrence.
As to the quantum we believe that the jury considered agent Tate’s financial ability in the award made by them, however, we feel that $2,000 would be in line with Tate’s financial ability for the various damages suffered by plaintiff.
It is therefore ordered, adjudged and decreed that the verdict of the jury and judgment of the court be annulled and reversed insofar as agents Rozas and Doucet are concerned, and plaintiff’s suit dismissed as to them.
It is further ordered, adjudged and decreed that the verdict of the jury and judgment of the lower court in favor of the plaintiff and against Honoré Tate be amended by fixing the amount due plaintiff at $2,000 to cover all damages and as thus amended affirmed, the defendant Honoré Tate to pay all costs of this proceeding.